## UNITED STATES *v.* FRUEHAUF ET AL.

No. 91.   Argued January 11, 1961.—Decided February 20, 1961.

*S. Hazard Gillespie, Jr.* argued the cause for the United States.   On the brief were *Solicitor General Rankin, Assistant Attorney General Wilkey, Beatrice Rosenberg* and *Eugene L. Grimm.*

*Louis Nizer* argued the cause for appellees.   With him on the briefs were *Charles Seligson, Cyrus R. Vance,*

*Mortimer A. Sullivan, Albert C. Bickford, Charles S. Burdell, Donald McL. Davidson, James D. Walsh, Albert I. Schmalholz* and *Melvin Lloyd Robbins.*

MR. JUSTICE FRANKFURTER delivered the opinion of the Court.

On June 17, 1959, an indictment in two counts was filed in the United States District Court for the Southern District of New York against appellees Roy Fruehauf, Fruehauf Trailer Co., Burge Seymour, Associated Transport, Inc., and Brown Equipment and Manufacturing Co. (hereinafter referred to collectively as the Fruehauf-Seymour group) [1] and appellee Dave Beck. The first count, based on § 302 (a) of the Labor Management Relations Act, 1947, 61 Stat. 157, 29 U. S. C. § 186 (a), which makes it unlawful "for any employer to pay or deliver, or to agree to pay or deliver, any money or other thing of value to any representative of any of his employees who are employed in an industry affecting commerce," [2] charged that on or about June 21, 1954, each of the appellees of the Fruehauf-Seymour group, employers of employees engaged in an industry affecting commerce,

"did unlawfully, wilfully and knowingly pay and deliver and agree to pay and deliver to Dave Beck,

---

[1] It appears that Roy Fruehauf is President of Fruehauf Trailer Co., that Burge Seymour is President of Associated Transport, Inc., and that Brown Equipment and Manufacturing Co. is a wholly owned subsidiary of Associated Transport, Inc.

[2] Section 505 of the Labor-Management Reporting and Disclosure Act of 1959, 73 Stat. 537, enacted September 14, 1959, amended this section to read, in pertinent part:

"It shall be unlawful for any employer or association of employers or any person who acts as a labor relations expert, adviser, or consultant to an employer or who acts in the interest of an employer to pay, lend, or deliver, or agree to pay, lend, or deliver, any money or other thing of value—

"(1) to any representative of any of his employees who are employed in an industry affecting commerce . . . ."

President, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, a representative of the aforesaid employees, a thing of value, to wit, money, in the amount of $200,000."

The second count, based on § 302 (b), 61 Stat. 157, 29 U. S. C. § 186 (b), and similarly couched in the words of the statute,[3] charged that Beck had received and accepted, and agreed to receive and accept, from the appellees of the Fruehauf-Seymour group, $200,000. All of the appellees entered pleas of not guilty; after various pretrial proceedings, during the course of which "trial memoranda" were submitted by the Government and by several of the appellees, the case came on for trial. At the outset of the hearing, the district judge suggested that if, as he was advised by the trial memoranda of certain among the appellees, any of them intended to move for dismissal of the indictment, such a motion should be made at that time. Counsel for the appellees replied that they "would be in a better position to address ourselves to the grounds for a dismissal after the government had made an opening here, . . . if on inquiry in this pretrial, preliminary conference, the government conceded certain positions that it has conceded at arraignment and other places in

---

[3] Count Two of the indictment charged that "On or about the 21st day of June, 1954, . . . Dave Beck, . . . a representative of employees who were engaged in an industry affecting commerce . . . did unlawfully, wilfully and knowingly receive and accept and agree to receive and accept from [the several appellees of the Fruehauf-Seymour group], employers of the aforesaid employees, a thing of value, to wit, money, in the amount of $200,000." Section 302 (b), as it was in effect at the time of the transaction alleged, provided: "It shall be unlawful for any representative of any employees who are employed in an industry affecting commerce to receive or accept, or to agree to receive or accept, from the employer of such employees any money or other thing of value." The Labor-Management Reporting and Disclosure Act of 1959, § 505, amended the section to cause it to parallel the amended version of § 302 (a), note 2, *supra*.

the minutes." The district judge then read into the record an extended excerpt from the Government's trial memorandum [4] which purported to outline the "facts which support the charge and which the government intends to prove." These were: (A) That Beck asked Roy Fruehauf to "lend him $200,000," which "loan" was subsequently discussed at a meeting of Fruehauf and attorneys for Beck and Fruehauf Trailer Co.; that after unsuccessful attempts to "place the loan" with officers of various banks, "Fruehauf and Burge Seymour found it necessary to arrange the loan without the aid of financial institutions and, instead, processed it through the Fruehauf Trailer Co. (Roy Fruehauf, president), Associated Transport Co. (Burge Seymour, president), and the latter's wholly owned subsidiary Brown Equipment and Manufacturing Co." (B) That "The method by which this otherwise simple transfer of $200,000.00 from Fruehauf to Beck was effected is a fairly complex one, apparently caused by difficulties encountered by the defendant employers in effectuating what they have called a 'loan' but without officers of their corporations learning of the transaction." (C) That "[T]he details of this circuitous financing operations [sic]" were as follows: Inasmuch as "Neither Fruehauf nor Seymour wished to effect the loan by use of personal funds," and "neither Fruehauf nor Seymour felt that their respective corporations could overtly finance the transfer of funds in such an amount without embarrassing themselves," it was determined that

---

[4] The memorandum has not been made a part of the record in this Court. As read into the record, in part, by the district judge, it appears to have been prefixed by the statement:

"This memorandum is submitted for the purpose of supplying the Court with a general outline and analysis of the facts the government intends to prove together with an exposition of the statutory and decsional [sic] law regarding the crime charged in the instant case."

the Brown Company "would actually make the transfer to Beck." Thereupon, (1) on June 21, 1954, Fruehauf Trailer Co. "transferred" $175,000 by check to Brown in exchange for Brown's $175,000 promissory note, payable December 30, 1954, and "purporting to bear interest in the amount of 5% per annum," whereas, in fact, "no interest was ever paid to, or even anticipated by, Fruehauf or his corporation." (2) Brown, on the same date, transferred $200,000 to Beck in return for Beck's promissory note for that amount at 4% per annum, payable December 30, 1954—a Brown check requisition form which falsely listed the object of this transfer being explained by Seymour as intended to conceal from "the people in Associated . . . that Beck was borrowing Associated funds." (3) Associated, on the same date, transferred $200,000 to Brown. One week later, Brown returned to Associated $175,000, the amount lent Brown by Fruehauf. On December 30, 1954, "after Seymour had renegotiated the loan with Manufacturers Trust Co.," Brown returned the remaining $25,000 to Associated. ("It should be noted that Beck was supposed to, but did not, repay the 'loan' to Brown by December 30, 1954.") (4) On December 27, 1954, Seymour borrowed $200,000 at 4% per annum for 90 days from Manufacturers Trust Co., collateralizing the loan with Beck's note and obligations of Fruehauf, Seymour and others, including an attorney for Fruehauf Trailer Co. (5) Seymour paid $2,066.66 interest to Manufacturers Trust, and by check dated March 30, 1955, returned the $200,000 loan to the bank. (6) "Beck paid the $200,000 loan from Brown by remitting to Seymour $163,215. on or about April 11, 1955, and $36,785. on or about June 30, 1955, which Seymour endorsed to Brown." (7) "Only $4,000 interest, approximately half of the interest due, was actually paid and that was remitted in the form of a check . . . [from Fruehauf Trailer Co.'s attorney] to Seymour."

Having read this portion of the Government's memorandum for the purpose of making known to the appellees "the government's position, at least on the matter of the loan," the district judge ruled that "in my view that statement by the government is a judicial admission that the transaction was a loan. As a matter of fact, to verify that belief, the government later argues in its brief that the use of the money was a thing of value. So at least, so far as I am concerned, there can be no dispute that the government's position is that this was a loan, and we are now resolved to the question of whether a loan under these circumstances was illegal under the statute . . . ."

"[O]n the basis of the disclosure by the Court of what the Court understands to be a judicial admission by the government," the court then asked, again, whether appellees wished to be heard on a motion to dismiss. At this point, government counsel interposed "to communicate one thought to the Court that may not have been communicated by my brief." He stated:

"Despite the fact that there is the repeated use of the word 'loan' in the government's advance outline before the Court, caused by the fact that the government's case in large part is as asserted by these defendants as the trial will reflect as it proceeds, nevertheless the government's position on the loan, and I hope to make this clear as the trial progresses, is actually twofold.

"A loan, if your Honor please, is something that relates to a state of mind between the person who is receiving the money and the person who is giving the money, and again the repayment which actually occurred in this case is only one aspect of whether or not the transfer of funds between one party or from one party to another is actually a loan.

"Now, to be quite specific, I will simply say that the position that the government takes is that the

government has called this a loan, and in reiterating the facts as we know them from the defendants, the defendants having repeatedly used the word 'loan,' we say that this is not necessarily so, because in fact any loan when it is made, to prove the fact that it was a loan, goes through certain stages, and is accompanied by certain attributes and here those items were not present in this case."

After adverting to the size of the "loan," the fact that no collateral was given, and the facts that the "loan" could not be processed through financial institutions, that no interest was paid between the corporations although the transaction purported to require its payment, and that Beck did not in fact pay the 4% interest due under the terms of his note to Brown, government counsel concluded: "That is our first position. And the second position is that even if this is a loan as a matter of law it is still encompassed within the statute." The district judge replied:

"I do not think that anything you said detracts from the argument that you made in your memorandum, that you are going to prove that this was a loan, and on that basis I intend to entertain an application with respect to the dismissal of the indictment."

All of the appellees moved to dismiss on the ground, among others, that the transaction between Beck and the Fruehauf-Seymour group, being a "loan," was not within the prohibition of the statute. Argument on the motion was had, and government counsel reiterated his position:

"The COURT: Assuming that this case was tried and the Court was disposed to frame special interrogatories to the jury, and one of those interrogatories was, Was the transaction a loan, and the jury brought back the answer No: do you think the Court could allow that answer to stand on the basis of the facts

as you have set them forth in your brief, or wouldn't the Court have to set aside the finding as being contrary to the evidence and the weight of the evidence?

"Mr. GUZZETTA: Your Honor, in the context of the remarks I made after you read in open court my brief, I would say that that would not be an erroneous finding by them.

"The COURT: In other words, your position is that despite the facts which you set forth this could be held to be not a loan? When I say the facts you set forth, I mean the facts in your memorandum.

"Mr. GUZZETTA: As I tried to indicate, . . . the government's position is twofold. If it wasn't a loan, if the jury determine on the basis of the facts which they hear that this was—that the outer clothing, fabricated by one highly complex intercorporate transaction, didn't make this transfer a loan, clearly, it would come within the statute. There would be no problem in my mind at all. Secondly, if the jury decided that it was a loan, I wouldn't say that that would preclude them from finding a verdict of guilty because . . . a loan is encompassed under the statute."

The District Court granted the motions to dismiss the indictment as to all of the appellees. It ruled:

"I am convinced that the language which I read into the record from the Government's brief is a judicial admission that this transaction was a loan. I have no doubt in my own mind at least, that in a trial either to the court or the jury, in a preliminary hearing where the defendants have not yet subjected themselves to jeopardy, if the Government established the facts which it recounted in its brief that it intended to prove, a finding by a jury to the contrary would have to be set aside, nor could the Court

find to the contrary. Those facts, in my view, notwithstanding the qualifications attempted orally, and despite those qualifications and accepting those qualifications, those facts, in my view, establish that the transaction was a pure and simple loan.

". . . Having found as I do on the Government's judicial admission that the transaction was a loan, we must then resolve whether the transaction as a loan was violative of the statute as it was at the time of the transaction, and I am of the opinion that it was not."

From this oral ruling the Government brought the case here by direct appeal pursuant to the Criminal Appeals Act, 18 U. S. C. § 3731. The sole question presented in its Jurisdictional Statement is "whether a loan of money comes within the . . . prohibitions" of § 302 of the Labor Management Relations Act, 1947.[5] Briefs and oral argument in this Court proceeded upon the assumption that this question, and only this question, was properly raised by the record, and that the question, thus shaped, presupposed the substantial reality and *bona fides* of the "loan." Counsel for the Government, in response to questions from the bench, asserted that in light of the framing of the issues on this direct appeal, the Government's trial theory would have to be that the Beck-Fruehauf-Seymour transaction was an incontestable, good-faith loan at a fair rate of interest, and that such other circumstances of the transaction as the lack of collateral would be immaterial. However, in a subsequent com-

---

[5] This statement of the question differs from that in the Government's Notice of Appeal, which stated the issue to be "Whether the payment of money by an employer (of employees in an industry affecting commerce) to a representative of his employees, intending repayment of said money with interest, is within the proscriptions of Section 302 (a) and (b) of the Labor Management Relations Act, 1947 . . . ."

munication addressed to the Court and opposing counsel by the Solicitor General, the Government took the position "that the Court may properly take account in disposing of this case of the salient facts with respect to the transaction, as developed by the prosecutor before the district judge and as taken into account by the district judge in dismissing the indictment, and that the question before the Court may be considered in the factual context in which it was presented; the question presented fairly comprised the two issues of (1) whether any loan was covered by Section 302, and (2) whether this loan was covered by Section 302."

On this record, the question put to the Court for our direct review under 18 U. S. C. § 3731 is left unclear. An indictment cast in statutory language has been dismissed for failure to charge an offense within the meaning of the legislation whose words it employs, on the ground (as expressed in the ruling of the District Court) that the Government's trial memorandum constituted a "judicial admission that the transaction was a loan." The portions of the trial memorandum upon which this ruling rests establish, at most, that approximately a year after the Fruehauf-Seymour group transferred $200,000 to Beck, Beck transferred $200,000 back to the Fruehauf-Seymour group, with $4,000 "interest," "approximately half of the interest due." On the basis of such facts, putting aside of course all questions of variance between indictment and proof that might emerge at a trial, seemingly the Government might have attempted to make out violations of § 302 on any of a number of alternative theories: (1) that the "loan" was a sham, a mere ruse and covering device intended to pass from Fruehauf and Seymour to Beck a gift or bribe of money; (2) that irrespective of intention, the acceptance by the Fruehauf-Seymour group of $200,000 plus $4,000 interest in satisfaction of Beck's obligation to repay the "loan" with twice

that amount of interest constituted a forbidden delivery of the unpaid interest to Beck; (3) that irrespective of the terms of Beck's note, the loan of a large sum of money at a rate of interest significantly lower than the going commercial rate effected a delivery to Beck of the difference between the interest payable at a commercial rate and the interest agreed on; (4) that irrespective of the interest rate, the transaction—by which Fruehauf and Seymour made available a large, unsecured loan which Beck could not have gotten through normal financing channels—resulted in the delivery to Beck of a "thing of value," namely, the benefit of having the money in hand; (5) that irrespective of the particular incidents of this transaction, all loans, as such, violate the statute, either because the use of money is itself a "thing of value" which may not in any case be delivered by an employer to his employees' representative, even in consideration of the payment of interest, under the statute, or because every loan, *qua* loan, comports the "delivery" of the thing loaned, which delivery (regardless of repayment) violates § 302.[6]  However, the District Court's ruling that, by admission of the Government, the transaction was a "loan," appears to mean that, in light of its trial memorandum, the Government is foreclosed from pursuing some, probably most, of these theories.  Which among them the court thus viewed as closed remains uncertain. On the other hand, in a representation to this Court, the Solicitor General does not leave it unequivocally clear, so as to preclude controversy in the lower court were the case to be allowed to go to trial, which (if not all) of the theories he would regard as still open.  The only issue

---

[6] Subsection (c) of § 302 excepts five enumerated situations from the section's broad ban on delivery or receipt of any thing of value: *e. g.,* § 302 (c)(3) provides that the section shall not be applicable "with respect to the sale or purchase of an article or commodity at the prevailing market price in the regular course of business."

which we can be sure that the District Court decided as a matter of construction of the statute (as distinguished from those issues which the District Court held could not be proved under the indictment consistently with the Government's "judicial admission") is the issue posed by the fifth theory above—the issue posed, in its most evidently abstract form, by the question presented here in the Government's Jurisdictional Statement—"whether a loan of money," every loan of money, as such, "comes within the [statute's] . . . prohibitions."

We do not reach that question on this appeal. For we cannot but regard it—abstracted as it has become, in the course of these proceedings, from the immediate considerations which should determine the disposition of appellees' motions to dismiss an indictment incontestably valid on its face—as other than a request for an advisory opinion. Such opinions, such advance expressions of legal judgment upon issues which remain unfocused because they are not pressed before the Court with that clear concreteness provided when a question emerges precisely framed and necessary for decision from a clash of adversary argument exploring every aspect of a multifaced situation embracing conflicting and demanding interests, we have consistently refused to give. See *Parker v. Los Angeles County*, 338 U. S. 327; *Rescue Army v. Municipal Court*, 331 U. S. 549; *United Public Workers v. Mitchell*, 330 U. S. 75; *Alabama State Federation of Labor v. McAdory*, 325 U. S. 450; *Arizona v. California*, 283 U. S. 423.

Nor does the record raise questions concerning the sufficiency of the indictment which would require, in an appropriate case, that the case be sent to the Court of Appeals, pursuant to 18 U. S. C. § 3731. For this is not a case in which the District Court has construed the allegations of an indictment, or limited the scope of the Government's presentation by construction of a bill of

particulars or the prosecutor's opening statement. In the present case we cannot know with reference to what supposed factual circumstances the District Court attributed to the Government the admission that the Beck-Fruehauf-Seymour transaction constituted a "loan." Without spelling out in detail the diverse argumentative possibilities that underlie the judge's attribution of a "loan" as an unequivocally defined concept to the Government, it suffices to say that experience in instances of similar unclarity under the Criminal Appeals Act counsels the wisdom of abstaining from reviewing construction of a criminal statute on so cloudy a record as is now before the Court. Compare *United States* v. *Colgate & Co.*, 250 U. S. 300, with *United States* v. *A. Schrader's Son, Inc.*, 252 U. S. 85.

The core of the difficulty in the present case is that the record does not preclude the Government from attempting to prove that the transaction in question came within the statutory ban by reason of any or all possible theories. Of course, an undertaking by counsel here, however honorable its impulse, cannot bind the Government in the future. And the District Court's ruling, insofar as it purports to close any avenues open to the Government under the indictment—not in view of specifications made in a bill of particulars or an opening statement, but on the basis of a "judicial admission" culled from a pretrial memorandum—was impermissible and constitutes an insufficient basis to justify the exercise of this Court's jurisdiction on direct appeal.

We do not think, however, that the purpose of Rule 15 of this Court, under which the Government filed the Jurisdictional Statement which brought the case here, requires us to penalize the Government by dismissing this appeal, *simpliciter*. This Court has the power, expressly provided in 28 U. S. C. § 2106, to "vacate, set aside or

reverse any judgment, decree, or order of a court lawfully brought before it for review, and . . . remand the cause and . . . require such further proceedings to be had as may be just under the circumstances." The exercise of that authority is appropriate here. The ruling dismissing the indictment is set aside and the case is remanded for trial upon this valid indictment.

*So ordered.*

Mr. Justice Stewart, dissenting.

The dismissal of the indictment in this case was placed squarely upon the district court's construction of a criminal statute. Specifically, the court ruled that a loan of money did not fall within the prohibition of § 302 of the Labor Management Relations Act of 1947 (before its amendment in 1959). In bringing the appeal directly here, the Government eliminated from the case any possible questions other than the correctness of the district court's construction of the underlying statute—to which this Court's jurisdiction is limited under the Criminal Appeals Act. 18 U. S. C. § 3731. *United States* v. *Keitel,* 211 U. S. 370, 397–398; *United States* v. *Patten,* 226 U. S. 525, 535, 540; *United States* v. *Colgate & Co.,* 250 U. S. 300, 301, 306; *United States* v. *Borden Co.,* 308 U. S. 188, 192–194. "[I]n reviewing a direct appeal from a District Court under the Criminal Appeals Act, *supra,* our review is limited to the validity or construction of the contested statute. For 'The Government's appeal does not open the whole case.' " *United States* v. *Petrillo,* 332 U. S. 1, 5.

I think the issue whether a loan of money came within the proscriptions of the statute is before us now and should be decided. I further think this is the only issue properly before us. However, since the Court thinks otherwise, I am persuaded that an expression of my views on the subject would not be appropriate.